502 So.2d 446 (1986)
STATE of Florida, Appellant,
v.
Carlos Franco SUCO, Appellee.
No. 85-2605.
District Court of Appeal of Florida, Third District.
December 16, 1986.
On Rehearing March 3, 1987.
*447 Robert A. Butterworth, Atty. Gen. and Jack B. Ludin and Richard Kaplan, Asst. Attys. Gen., for appellant.
Bierman, Sonnett, Shohat & Sale and Ira N. Loewy, for appellee.
Before SCHWARTZ, C.J., and HUBBART and DANIEL S. PEARSON, JJ.
HUBBART, Judge.
This is an appeal by the state from an order suppressing, in part, certain evidence obtained from the search of a private house. The central issue presented is whether a lessor's Fourth Amendment rights are invaded by an otherwise unreasonable search of his leased premises conducted by police where, as here, the lessor (1) retains and exercises a possessory interest in the said premises, and (2) is present on the premises with the permission of the lessee at the time of the search and does not consent to same. For the reasons which follow, we conclude that the lessor's Fourth Amendment rights are invaded upon either one of the above showings. We, accordingly, affirm.

I
The evidence which the trial court suppressed in this case was seized by officers of the Metro-Dade Police Department pursuant to a warrantless search of a single family home located at 6977 S.W. 148 Terrace, in unincorporated Dade County, Florida. The home was owned by the defendant Carlos Franco Suco who had purchased it on August 31, 1984. In January 1985, the defendant Suco orally leased the home on a six-month basis (January-July 1985) to the codefendants Jorge and Isabel Betancur, who commenced living on the premises with their three children. Although the defendant Suco did not reside at the house, he frequently was there to collect the rent and to ensure that proper maintenance was conducted and necessary repairs made to the house. Moreover, he possessed a key to the front door and had the right to enter the house whenever he chose, as there were no stated restrictions to his right of entry.

A
On June 7, 1985, at approximately 9:00 P.M., the defendant Suco, accompanied by the codefendant Jorge Navarrette, walked up to the front door of the aforesaid house and knocked on it. The codefendant Isabel Betancur was in the laundry room of the house and did not hear the knock. When no one answered the door, the defendant Suco used his key to open the door himself and entered the house. He proceeded to walk to the family room where he sat down on a couch and began to watch television with the Betancur children.
At approximately the same time, Officers Noberto Gonzalez and Mark Silvia of the Metro-Dade Police Department were on patrol in the area in an unmarked police car surveilling the area for possible home invasion robberies. The officers saw the defendant Suco and the codefendant Navarrette standing at the front door of the above house as they passed in their car. Their suspicions aroused, the officers circled back to the house and observed that the two men they had seen earlier were no longer there. They then surveilled the premises for about fifteen minutes during which time nothing happened. Determined to investigate the matter further, they called for backup police assistance. Two backup police units arrived: Officer Roberto Morales, a uniformed officer, and Officers Leslie Cravens and Tom Gross who were also patrolling the area for possible home invasion robberies.
After the arrival of the backup units, Officers Gonzalez and Silvia went around to the back of the house. Gonzalez was unable to observe from his vantage point the two Betancur children watching television in the living room area. He then returned to the front door and, accompanied by Officer Morales, knocked on the *448 door. The codefendant Isabel Betancur, with a small baby in her arms, answered the door and had a conversation with the two officers.
During this conversation, Officer Silvia, in back of the house, was able to observe the defendant Suco walk out of the kitchen area, sit down and begin watching a Flintstone cartoon on television; Officer Silvia also saw the codefendant Navarrette walk from the kitchen area to the area where the television was, turn around, and walk back to the kitchen. Plainly, neither Officer Gonzalez nor Officer Silvia observed anything suspicious in the house and nothing whatever to indicate that a home invasion robbery was taking place.
Meanwhile in the front of the house, Officers Morales and Gonzalez conversed with the codefendant Isabel Betancur. Mrs. Betancur was totally unaware that the defendant Suco and the codefendant Navarrette were in the house. Without going into all the details of this conversation, suffice it to say that the trial court found that Mrs. Betancur voluntarily consented to allow the police to enter the house for the purpose of locating two men whom the police suspected might be home invaders.

B
Officers Gonzalez, Morales and Cravens then entered the house with their guns drawn and, after a short period of time, discovered that no home invasion had taken place. They observed the defendant Suco sitting in the living room watching television; Mrs. Betancur immediately had a brief conversation with Suco as to when he had entered the house, and it was obvious to the police that the two were acquainted. The police also observed the codefendant Navarrette standing by the door of the northwest bedroom, and he too presented no evidence of being a home invader. There followed two distinct searches conducted by the police.

1
First, Officer Cravens continued his search for possible home invaders by walking down the hall into the northeast bedroom of the house. He observed a table in the middle of the room with paper, rubber bands, and writing implements on it. He also saw a box on the floor with a large amount of United States currency in it and two vinyl suitcases with the sides slashed. He looked in the closet of the bedroom and discovered a bag with money in it. He asked the codefendants Navarrette and Isabel Betancur whose money was in the box, and both responded with a shrug. Cravens suspected at that time that he had stumbled on a large amount of illegal drug money, returned to the living room, and so informed the other officers.
The police then ordered everyone outside the house onto the front porch where the officers obtained identification from the defendant Suco and the codefendants Isabel Betancur and Navarrette. While the suspects remained on the porch in police custody, Officers Cravens and Gonzalez reentered the house and went back to the northeast bedroom to inspect the cash there. While in the room, they observed a ledger book on a table and a garbage-type plastic bag which contained money. Gonzalez peeled back a flap on one of the slashed vinyl suitcases and saw coffee grounds on the inside lining.
Eventually, the police seized the above-stated physical evidence from the northeast bedroom. The trial court ruled below that the above evidence was reasonably seized by the police pursuant to the plain view doctrine. Although the defendant Suco has attempted to cross-appeal this ruling, he has since abandoned same as, plainly, this court has no jurisdiction to entertain such a cross-appeal. State v. Ferguson, 405 So.2d 294 (Fla. 4th DCA 1981); State v. DeConingh, 396 So.2d 858 (Fla. 3d DCA 1981); State v. Clark, 384 So.2d 687 (Fla. 4th DCA), pet. for review denied, 392 So.2d 1372 (Fla. 1980). This aspect of the trial court's ruling is, therefore, not before us today, and, accordingly, we express no views as to the propriety of same.

*449 2
Second, the police escorted the defendant Suco and the codefendants Isabel Betancur and Navarrette into the house, and separated Mrs. Betancur from the rest of the group. They learned from her that she had a revolver in the master bedroom and they seized same. The police then gathered everyone in the living room and learned that the defendant Suco was the owner of the house. The police then separated Suco from the rest of the group and attempted to obtain his consent to search the house. Suco refused to give such consent.
At approximately 10:00 P.M., Officer Fernandez took the codefendant Isabel Betancur aside again and had a conversation with her. Without going into all the details of this conversation, suffice it to say that Mrs. Betancur eventually signed a written form consenting to a police search of the house. The police then conducted a general search of the house, during which time they discovered and seized 208 kilos of cocaine, cash and three semiautomatic weapons.
The trial court specifically found the following with reference to Mrs. Betancur's consent for this general search:
"4. The Court specifically finds that ISABEL BETANCUR did not freely consent to the subsequent search of the house either orally or in writing. This Court specifically finds that the consent form signed by Isabel Betancur was, under the totality of the circumstances, not freely, voluntarily, and knowingly signed. The Court finds, based upon the evidence, that the consent to search form and Miranda waiver form which were shown to ISABEL BETANCUR and which she was simply asked to read and sign, were not explained to her and that no adequate effort was made by Officer Fernandez to ensure that the forms were understood by ISABEL BETANCUR and that she was freely and voluntarily waiving her rights. The Court notes that the burden is upon the State to prove through clear and convincing evidence that ISABEL BETANCUR freely consented to the search of the home. In this case, not only has the State failed to meet its burden, but this Court is convinced by the clear and convincing evidence that ISABEL BETANCUR did not consent to the search of her home."
The state does not contest this finding on appeal.

C
The defendant Suco and the codefendants Jorge Navarrette, Jorge Betancur, and Isabel Betancur were subsequently charged by information with (1) trafficking in cocaine, and (2) conspiracy to traffic in cocaine, before the Circuit Court for the Eleventh Judicial Circuit of Florida. After pleas of not guilty were entered, the defendant Suco filed a motion to suppress the fruits of the search of the house on the basis that said search was unreasonable under the Fourth Amendment. The codefendants Jorge and Isabel Betancur filed a similar motion to suppress.
The trial court conducted an evidentiary hearing on the above motions to suppress in which the above-stated facts were established. The trial court then entered an order denying the motion to suppress as to the search of the northeast bedroom of the house (the first search), and granting the motion to suppress as to the search of the rest of the house (the second search). The state appeals the adverse portion of the above order solely as to the defendant Suco; the state has taken no appeal from the order as to the defendants Jorge and Isabel Betancur.

II
The state, in effect, concedes that after the initial search of the northeast bedroom, an unreasonable search of the subject house occurred in this case, in violation of the Fourth Amendment.[1] The state urges, *450 however, that the defendant Suco cannot complain about this unreasonable search because his Fourth Amendment rights were not violated. This is so, the state argues, because the defendant Suco was a mere landlord of the subject house, having orally leased same to the codefendants Jorge and Isabel Betancur, and, therefore, the house in question was not his "house[]" within the meaning of the Fourth Amendment as he had no reasonable expectation of privacy therein. Only the tenants of the house, the codefendants Jorge and Isabel Betancur, can complain about this unreasonable search, argues the state, because only their reasonable expectation of privacy under the Fourth Amendment was disturbed by the subject search.
The defendant Suco, on the other hand, rejects this analysis. He agrees that the Betancurs' reasonable expectation of privacy was invaded by the search in this case, but argues that his reasonable expectation of privacy was also invaded. This is so, he argues, because he had a significant right of access to the subject premises, notwithstanding the oral lease of same. This being so, it is urged that the subject house was Suco's, as well as Betancur's, "house[]" within the meaning of the Fourth Amendment, and therefore Suco's Fourth Amendment rights were violated by the conceded unreasonable search therein.
In order to pass on the relative merits of these respective legal positions, it is necessary (1) to examine the applicable Fourth Amendment law on this subject, and (2) to apply that law to this case. This analysis leads us to agree with the defendant Suco's position in this case, and to reject the state's position.

A
The Fourth Amendment to the United States Constitution, as made enforceable against the states through the due process clause of the Fourteenth Amendment,[2] provides that: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated... ." Article I, Section 12 of the Florida Constitution contains a virtually identical provision.[3]
Two requirements must necessarily be met before any person may successfully claim that his rights guaranteed by the above constitutional provisions have been violated. First, there must be a "search[] and seizure[]" of that individual's "person[], house[], papers [or] effects" conducted by an agent of the government; stated differently, there must be an official invasion of that individual's reasonable expectation of privacy. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Norman v. State, 379 So.2d 643 (Fla. 1980); Elson v. State, 337 So.2d 959, 963 (Fla. 1976); State v. Oliver, 368 So.2d 1331, 1335 (Fla. 3d DCA 1979), cert. dismissed, 383 So.2d 1200 (Fla. 1980). *451 Second, the search and seizure in question, must be "unreasonable," as not all searches and seizures are proscribed by the above constitutional provisions, but only those which are "unreasonable," Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960); Chacon v. State, 102 So.2d 578, 588 (Fla. 1957); Brown v. State, 46 So.2d 479 (Fla. 1950); stated differently, the official invasion of one's reasonable expectation of privacy must be an "unreasonable" invasion.
Both the foregoing requirements are separate and distinct and both must be met before there can be any violation of an individual's rights guaranteed by the above constitutional provisions. Rawlings v. Kentucky, 448 U.S. 98, 112, 100 S.Ct. 2556, 2565, 65 L.Ed.2d 633, 646 (1980) (Blackmun, J., concurring). Moreover, any evidence secured in violation of either of the above constitutional provisions is, with some exceptions not relevant here, inadmissible in evidence in a Florida court against the person whose search and seizure rights were violated. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Gildrie v. State, 94 Fla. 134, 113 So. 704 (1927); Art. I, § 12, Fla. Const.
As to the first of the Fourth Amendment requirements, the only one at issue herein, it is well-settled that "if the owner of certain premises has leased them to another without reserving any right of possession to himself, then it cannot be said that a police intrusion into those premises encroaches upon his expectation of privacy." 3 W. LaFave, Search and Seizure § 11.3(a), at 546 (1978). On the other hand, an opposite result obtains where, as here, a lessee retains and exercises certain possessory rights in the leased premises during the life of the lease. Beyond that, it is plain that an invited guest in a home has a reasonable expectation of privacy while physically in the home at the invitation of the home dweller. 3 W. LaFave, Search and Seizure § 11.3(b), at 553 (1978); see Rakas v. Illinois, 439 U.S. 128, 149, 99 S.Ct. 421, 433, 58 L.Ed.2d 387, 405 (1978); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

B
Turning to the instant case, we have no difficulty in concluding that the defendant Suco's Fourth Amendment rights were violated by the admittedly unreasonable search of the subject house because, in our view, the said defendant had a reasonable expectation of privacy therein. We reach this result for two independent reasons.
First, the defendant Suco retained and exercised certain possessory rights in the leased premises which gave him a reasonable privacy expectation therein. He had a key to the house and reserved the right to enter the leased premises to collect rent and to perform maintenance and repairs therein. He, in fact, exercised that right on the night in question by letting himself in the subject house when Mrs. Betancur did not hear his knock at the front door. Once inside the house, he made himself at home by sitting down on a couch in the family room to watch television. Plainly, he regarded this house as a place of some privacy for himself, and, in fact, had every legal right to entertain such an expectation given the nature of the oral lease in this case. Under the established law, this factor alone was sufficient to establish that Suco had a reasonable expectation of privacy in the house.
Second, the defendant Suco was on the premises with the consent of the lessee Mrs. Betancur at the time of the subject search, and, in fact, refused to consent to a police search of the premises. This being so, he was tantamount to an invited guest on the premises, and, as such, had a reasonable expectation of privacy therein; surely, an invited guest in a home, no less than the home dweller himself, is entitled to a reasonable expectation of privacy while in the home. On this basis alone, then, Suco's privacy interests were disturbed by the police search herein, quite apart from the fact that he otherwise had a possessory interest in the house. Under the established law, his invited presence on the premises at the time of the search was *452 sufficient, in itself, to establish that he had a reasonable expectation of privacy in the house.[4]
Given the state's concession that the search in this case, outside the northeast bedroom, was otherwise unreasonable under the Fourth Amendment, it is clear that the trial court committed no error in finding that the defendant Suco's Fourth Amendment rights were violated by the above-stated search. The order under review which suppresses the evidence seized from the house, outside the northeast bedroom, is, therefore, in all respects
Affirmed.

ON REHEARING
HUBBART, Judge.
The state has filed a motion for rehearing in which it brings to our attention several decisions relating to the standing of an invited guest to object to the search of a house. These decisions were not previously brought to our attention and deserve, we think, some comment.
We stated in our original opinion that "an invited guest in a home has a reasonable expectation of privacy while physically in the home at the invitation of the home dweller." 502 So.2d at 451. In stating this proposition, we cited Professor LaFave's standard work on the Fourth Amendment which, we think, correctly analyzes the applicable law on this subject:
"Assume, for example, that A has been invited to be a dinner guest in B's home and that consequently he is there on a particular evening from 8 p.m. until 10 p.m. If the police make an illegal warrantless entry of B's home at 9 p.m. and find evidence which is now tendered against A, unquestionably A should be deemed to have standing to object to that entry, for it intruded upon A's interest in the security of his person. That is, while A is legitimately present in B's home as a dinner guest, it is quite reasonable for him to expect that B's residence constitutes a zone of privacy where he as an individual may expect to be free from unreasonable governmental interference. Entry of B's house in violation of the Fourth Amendment, even if unaccompanied by an arrest or search of A, may fairly be said to interfere with A's personal privacy. But if the police raided B's home at 7 p.m., it makes no sense to suggest that A has standing flowing from his 8 p.m. invitation; and if the raid were at 11 p.m. it can hardly be said that A has standing merely because his visit terminated only an hour earlier."
4 W. LaFave, Search and Seizure § 11.3(b), at 292 (2d ed. 1987) (footnotes omitted). LaFave then analyzes the impact of Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), and states:
"From this language and other comments in Rakas, it might well be concluded that a person who is not a regular resident of the premises in question or who does not have `complete dominion and control' over the premises at that time cannot have standing to object to a police search of the premises where he is lawfully present, at least if the search does not result in the seizure of his property. But such an unsound rule is not dictated by Rakas, for the approach of the four dissenters, and the two concurring justices points in the other direction. The concurring opinion recognizes, as does the dissent, that the Fourth Amendment also protects the security of the person and that this aspect of the Amendment was not at issue in Rakas because the defendants `do not challenge the constitutionality of the police action in stopping the automobile in which they were riding; nor do they complain of being made to get out of the vehicle.' As noted herein, if the Rakas defendants *453 had made such a challenge, then certainly they would have standing with respect to that claim, for their personal freedom was intruded upon by the stopping of the car and their ejection from it.
If that is so, then it would seem, notwithstanding Rakas, that if the police, without required notice or without probable cause or without a required search warrant, burst into B's home and disrupt a dinner party at which A is present as a guest, then certainly A should be deemed to have standing to object  just as passengers in a car may object to its illegal stopping. Dinner guest A has had his freedom, privacy and solitude intruded upon by the police, and thus he has standing to object to that encroachment upon his rights, even if it led to the discovery of evidence in B's basement, a place A (in Justice Rehnquist's language) `has never seen, or been permitted to visit.' On the other hand, it is fully consistent with the Rakas reasoning and result to say that if the intrusion itself was lawful, then A's lawful presence would not alone give him standing as to any subsequent illegalities which did not increase appreciably the interference with A's personal freedom. Unfortunately, some courts have not read Rakas carefully and thus have not recognized this critical distinction."
4 W. LaFave, supra, at 293-96 (emphasis in original) (footnotes omitted).
United States v. Rackley, 742 F.2d 1266 (11th Cir.1984), cited by the state, is not contrary to this analysis because the invited guest there was not on the premises at the time of the search and consequently could not assert an invasion of privacy based on an illegal entry of the premises; indeed, LaFave cites this case with approval as being consistent with his analysis. 4 W. LaFave, supra, at 292 n. 60 (2d ed. 1987). State v. Loomis, 418 So.2d 482 (Fla. 4th DCA 1982), also cited by the state, seems equally distinguishable on the same basis, as the invited guest there was in the back yard of the house amidst some marijuana plants at the time of the search of the garage, and there is no indication that he was ever in the house or on the premises where the search occurred. We acknowledge, however, that State v. Mallory, 409 So.2d 1222 (Fla. 2d DCA), pet. for review denied, 418 So.2d 1280 (Fla. 1982) and Daniels v. State, 411 So.2d 1034 (Fla. 1st DCA 1982)  both cited with disapproval by 4 W. LaFave, supra, at 294 n. 62, and 300 n. 89  appear to run contrary to the above legal analysis, although they are factually distinguishable from the instant case. In those cases, unlike the instant case, the defendant was not a lessor-owner of the searched premises with a possessory interest in same.
In any event, we adhere to our view that an invited guest has a reasonable expectation of privacy in the home while physically on the premises at the invitation of the home dweller. Like an invited guest in an automobile whose privacy is necessarily disturbed when an automobile is illegally stopped by the police, so too an invited guest in a dwelling may complain that his privacy has been disturbed whenever police illegally enter the dwelling. In the instant case, the defendant Suco, as the invited guest of his tenant, had every right to complain that his privacy was invaded when the police ushered everyone out of the premises and then back into the living room  where they brushed aside Suco's refusal to consent to a further search, coerced his tenant into allowing same, and then conducted a totally unauthorized second search of the dwelling. Even aside from Suco's possessory interest in the premises which alone gives him standing in this case, his presence on the premises with the consent of the tenant was enough in itself for him to complain that his privacy interests were disturbed by the unwarranted police action in this case.
Subject to the above clarification, then, as to the invited guest aspect of this case, we adhere to our original opinion and deny the state's motion for rehearing.
NOTES
[1] The state's concession is well taken as the search of the subject house, outside the northeast bedroom, was accomplished by the police without a search warrant pursuant to a coerced consent obtained from the lessee Isabel Betancur; it was also accomplished without the consent of the defendant Suco, the lessor of the premises. Plainly, such a search was unreasonable within the meaning of the Fourth Amendment and Article I, Section 12 of the Florida Constitution. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); Norman v. State, 379 So.2d 643 (Fla. 1980).
[2] Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).
[3] Article I, Section 12 of the Florida Constitution also contains a provision protecting the people against unreasonable electronic cavesdropping:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated."
It further contains interpretation and exclusionary rule provisions which are tied directly to the Fourth Amendment and United States Supreme Court interpretations thereof:
"This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution."
[4] We have no occasion to pass on the state's argument that the defendant Suco waived, in effect, his reasonable expectation of privacy in the northeast bedroom of the house by disclaiming any knowledge of its contents to the police. As previously stated, the present appeal does not involve the propriety of the police search of the northeast bedroom and we express no views thereon.